1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

GUSTAVO TORRES,

      Plaintiff,

      v.

G. ARELLANO, et al.,

      Defendants.

Case No.  1:15-cv-00575-DAD-MJS (PC)

**ORDER GRANTING, NUNC PRO TUNC TO OCTOBER 7, 2016, DEFENDANTS' MOTION FOR AN EXTENSION**

**(ECF No. 59)**

**FINDINGS AND RECOMMENDATION TO GRANT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**(ECF No. 61)**

**FOURTEEN DAY OBJECTION DEADLINE**

      Plaintiff is a state prisoner proceeding pro se and in forma pauperis in this civil rights action brought pursuant to 42 U.S.C. § 1983. The case proceeds on Plaintiff's complaint against Defendant G. Arellano for subjecting Plaintiff to inhumane conditions of confinement and against Defendant R. Montanez for failure to protect, in violation of the Eighth Amendment, and against Defendant Montanez for retaliation in violation of the First Amendment.  (ECF No. 1.)  Before the Court is Defendants' October 7, 2016 motion for summary judgment. (ECF No. 61.) Also before the Court is Defendants' August 30, 2016 motion for an extension of time to file a dispositive motion. (ECF No.

59.)

I.    **Motion for Extension of Time**

Pursuant to the Court's Discovery and Scheduling Order, the original deadline for filing dispositive motions was August 10, 2016. (ECF No. 27.) That deadline was then extended to September 9, 2016. (ECF No. 56.)

On August 30, 2016, Supervising Deputy Attorney General Gretchen Buechsenschuetz filed a motion requesting an extension of the dispositive motion deadline up to and until October 7, 2016, due to unforeseen medical issues affecting assigned Deputy Attorney General, Danielle Hemple. (ECF No. 59.)

Good cause appearing, Defendants' motion will be granted and the deadline for filing dispositive motions will be extended nunc pro tunc to October 7, 2016.

II.   **Legal Standard for Summary Judgment**

Any party may move for summary judgment, and "[t]he [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). If the movant will have the burden of proof at trial, it must demonstrate,

2

with affirmative evidence, that "no reasonable trier of fact could find other than for the moving party." Id. at 984.  In contrast, if the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." Id. (citing Celotex, 477 U.S. at 323). Once the moving party has met its burden, the nonmoving party must point to "specific facts showing that there is a genuine issue for trial." Id.  (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)).

In ruling on a motion for summary judgment, a court does not make credibility determinations or weigh evidence.  See Liberty Lobby, 477 U.S. at 255.  Rather, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Id.  Only admissible evidence may be considered in deciding a motion for summary judgment. Fed. R. Civ. P. 56(c)(2). "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."  Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).

## III.   Factual Allegations

Local Rule 260(b) requires that "any party opposing a motion for summary judgment . . . reproduce the itemized facts in the Statement of Undisputed Facts and admit those facts that are undisputed and deny those that are disputed, including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied on in support of that denial." Here, Plaintiff presents his own "Statement of Facts" but does not reference Defendants' Statement of Undisputed facts, and he fails to cite to any portion of the record supporting any of his own stated facts.  For these reasons, Defendants' facts will be deemed undisputed, except where a fact is brought into dispute by facts presented in Plaintiff's verified complaint and sworn opposition. See Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004); Johnson v. Meltzer, 134 F.3d 1393, 1399-1400 (9th Cir. 1998).

3

**A.      Facts Related to Conditions of Confinement**

At all times relevant to this suit, Plaintiff was in the custody of the California Department of Corrections and Rehabilitation ("CDCR") and incarcerated at the California Correctional Institution ("CCI") in Tehachapi, California. (Decl. of M. Dailo in Supp. of Mot. for Summ. J. ("MSJ") (ECF No. 61-5) ¶ 7.)

From August 18, 2014 to September 26, 2014, Plaintiff was assigned to Facility A, Building 8, Section B, management cell 103 ("Cell 8B-103") at CCI. (Dailo Decl. ¶ 8; Decl. of G. Arellano in Supp. of MSJ (ECF No. 61-2) ¶ 5.) According to Plaintiff, Defendant Arellano placed Plaintiff in this cell as punishment after Plaintiff refused to accept an assigned cellmate. (Pl.'s Opp'n to MSJ (ECF No. 64) at 19.)

Cell 8B-103 was equipped with a toilet, sink, blankets, sheets, and a mattress on the floor; there was no bed frame. (Arellano Decl. ¶ 5; Torres Dep. 86:8-21; 91:12-14.) Plaintiff states the mattress was torn, smelly, and stained with blood and urine. (Torres Dep. 91:4-6; Pl.'s Opp'n at 5.) Plaintiff also states he was never provided with clean bedding. (Compl. (ECF No. 1) at 4; Pl.'s Opp'n at 5; Torres Dep: 91:12-23.) Plaintiff stayed in this cell for 40-50 days. (Dailo Decl. ¶ 8; Arellano Decl. ¶ 5; Pl.'s Opp'n at 5.) He reports that he suffered back and neck pain from sleeping on the floor, although it was "not so severe." (Pl.'s Opp'n at 5; Torres Dep. 97:22-25, 98:21-24.) He never sought or received medical attention for this pain. (Pl.'s Opp'n at 5; Torres Dep. 98:2-8.) He did not suffer any other ailments due to the conditions of Cell 8B-103. (Torres Dep. 98:25-99:2; Pl.'s Opp'n at 13.)

During the 40-50 days Plaintiff was in Cell 8B-103, Defendant Arellano was a correctional sergeant assigned to supervise the unit. (Arellano Dec. ¶¶ 4-5.) In August and September of 2014, Arellano was assigned to the second watch, which covered the hours of 6:00 am to 2:00 pm. (Id. ¶ 7) Laundry exchange was performed during third watch, i.e., between the hours 2:00 pm to 10:00pm. (Id.) Plaintiff states that even though Arellano worked the second watch, he sometimes supervised the third watch

4

and assisted with laundry exchange. (Pl.'s Opp'n at 6.) According to Plaintiff, as the Sergeant, Arellano had control over everything that took place in the building. (Decl. of D. Hemple in Supp. of MSJ (ECF No. 61-6) Ex. A, Dep. of G. Torres 92:18-93:25.)

Arellano was not personally responsible for distributing bedding or collecting inmates' laundry. (Id.) Plaintiff states, however, that Arellano was responsible for supervising the employees who performed the laundry exchange. (Pl.'s Opp'n at 6.) Arellano states he did not believe, and did not have any reason to infer, that the conditions of Plaintiff's cells were so deficient as to present a substantial risk of harm to Plaintiff's health or safety. (Arellano Decl. ¶ 9.) Plaintiff, however, claims that Arellano was aware of the conditions in Plaintiff's cell and refused to issue Plaintiff a clean mattress and sheets or assign Plaintiff to a different cell. (Pl.'s Opp'n 6.) According to Plaintiff, when he complained to Arellano on one occasion about his mattress, Arellano said only "that's what he had." (Torres Dep. 95:3-96:3.)

### B.  Facts Related to Failure to Protect

On or about September 26, 2014, Defendant Montanez was involved in facilitating the double cell assignment of Plaintiff and an inmate named Diaz. (Decl. of R. Montanez in Supp. of MSJ (ECF No. 61-3) ¶ 5). Montanez completed parts 1 and 2 of the Administrative Segregation Unit/Security Housing Unit Double Cell Review ("Form 1882-B"). (Montanez Decl. ¶ 5; Montanez Decl. Ex. A.) This form was necessary since both Plaintiff and Diaz were housed in the administrative segregation unit. (Montanez Decl. ¶ 5.) Both inmates were also endorsed for the Special Needs Yard ("SNY"). (Decl. of K. Armstrong in Supp. of MSJ (ECF No. 61-4) ¶ 6.)

Montanez did not have the authority to approve inmate cell assignments. (Montanez Decl. ¶¶ 7-8; Pl.'s Opp'n at 7.) Instead, Acting Correctional Lieutenant K. Armstrong signed off on the Form 1882-B approving of the cell assignment. (Armstrong Decl. ¶¶ 4-5; Armstrong Decl. Ex. A; Montanez Decl. ¶ 8.)

Prior to the cell assignment, Montanez interviewed both Plaintiff and Diaz to ascertain whether they were willing to share a cell together; both inmates indicated their consent and signed the Form 1882-B. (Montanez Decl. ¶ 5; Montanez Decl. Ex. A; Torres Dep. 113:11-114:20.) Lieutenant Armstrong, possessing no information indicating the two inmates were incompatible, authorized their double cell assignment. (Armstrong Decl. ¶ 6.)

Plaintiff contends that during his interview with Montanez, Montanez told Plaintiff that Diaz had the "same issues" as Plaintiff. (Pl.'s Opp'n at 7; Compl. at 6; Torres Dep. 108:8-11.) Plaintiff understood this statement to mean that Diaz was a sex offender like Plaintiff. (Pl.'s Opp'n at 7; Compl. at 6; Torres Dep. 118:15-18.) Both parties acknowledge that during the interview, Plaintiff did not ask Montanez if Diaz was a sex offender or had sex-related commitment charges. (Montanez Decl. ¶ 6; Torres Dep. 112:17-19.) Both parties acknowledge that Montanez never explicitly told Plaintiff that Diaz was a sex offender or had sex-related commitment charges. (Montanez Decl. ¶ 6; Pl.'s Opp'n at 7; Torres Dep. 110:15-113:10.) However, Plaintiff states that Montanez knew of prior incidents in which Plaintiff was assaulted by a cellmate because of Plaintiff's sex offender status. (Pl.'s Opp'n at 6.) Plaintiff states that Montanez also knew that Plaintiff only wanted to be housed with another sex offender. (Pl.'s Opp'n at 6-7; Torres Dep. 116:14-16 ("The issue was that I was requesting somebody that have—that have [the same] sex offenses as me. And I was requesting that all the time."))

After Plaintiff and Diaz became cellmates, Plaintiff told Diaz that he was a sex offender. (Torres Dep. 122:2-6.) Diaz did not ask; Plaintiff volunteered the information. (Id.) Plaintiff did not tell Montanez that he had disclosed his status to Diaz. (Montanez Decl. ¶ 9.) Plaintiff did not suggest to Montanez that he was fearful of Diaz or that Diaz had pressured Plaintiff to disclose his commitment offense. (Id.) On October 4, 2014, one day after Plaintiff revealed he was a sex offender, Plaintiff and Diaz were involved in a physical altercation inside of their cell and Plaintiff cut Diaz's face with a razor

6

blade. (Torres Dep. 124:21-24; 128:23-129:1; 130:21-22; 133:13-21; Compl. at 6.) Diaz initiated the altercation after he found out that Plaintiff was a sex offender. (Pl.'s Opp'n at 7.) Plaintiff was left with marks and a bruise on his face. (Torres Dep. 133:13-21; Pl.'s Opp'n at 8.)

### C.   Facts Related to Retaliation

On October 16, 2014, Plaintiff appeared for an Institution Classification Committee ("ICC") hearing before Chief Deputy Warden J. Gutierrez. (Dailo Decl. ¶ 9; Compl. at 7.) During the hearing, Plaintiff verbally reported to Gutierrez that Montanez had engaged in misconduct. (Compl. at 7; Pl.'s Opp'n 8.) While Montanez has no recollection of Plaintiff making this complaint (Montanez Decl. ¶ 13), Plaintiff states that Montanez escorted Plaintiff to the ICC hearing and was "standing next to plaintiff" when Plaintiff made his complaint. (Pl.'s Opp'n at 8, 16-17.)

Plaintiff alleges that because of this complaint, "every time Plaintiff went out of his cell" Montanez searched and trashed it and took Plaintiff's personal belongings "such as books and food." (Pl.'s Opp'n at 8-9; Torres Dep. 141:1-7.) Defendants dispute this allegation and claim that Montanez searches of Plaintiff's cell were routine and pursuant to policy. (Montanez Decl. ¶ 11.) CDCR policy required Montanez to conduct a minimum of three cell searches per shift. (Id.) It was Defendant Montanez's practice to randomly select cells to search, and sometimes a cell would be searched twice within a relatively short period of time. (Id.) Conducting random searches prevented inmates from having advance notice of when searches would occur. (Id.) While Plaintiff acknowledges that Montanez is allowed to search inmates' cells "whenever he wants" (Torres Dep. 141:14-17), he claims that other officers who searched Plaintiff's cell would do so without disturbing Plaintiff's belongings. (Torres Dep. 141:17-21.)

Plaintiff states that on October 16, 2014, Montanez searched his cell after the ICC hearing. (Compl. at 7.) Montanez has no recollection of searching Plaintiff's cell on this date. (Montanez Decl. ¶ 11.) Plaintiff does not specify the dates of the other cell

searches. He also does not detail the specific items that Montanez removed from his cell.

On October 26, 2014, Plaintiff filed a formal grievance complaining about Montanez's double celling Plaintiff with Diaz. (Pl.'s Opp'n at 39-41, "Inmate/Parolee Appeal.")

## IV.   Discussion

### A.   Conditions of Confinement

#### 1.   Legal Standard

The Eighth Amendment protects prisoners from inhumane conditions of confinement. Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006).

Extreme deprivations are required to make out a conditions of confinement claim, and only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. Hudson v. McMillian, 503 U.S. 1, 9 (1992) (citations and quotations omitted). To maintain an Eighth Amendment claim, a prisoner must show that prison officials were deliberately indifferent to a substantial risk of harm to his health or safety. See, e.g., Farmer v. Brennan, 511 U.S. 825, 847 (1994); Thomas v. Ponder, 611 F.3d 1144, 1150-51 (9th Cir. 2010); Foster v. Runnels, 554 F.3d 807, 812-14 (9th Cir. 2009); Morgan, 465 F.3d at 1045; Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000); Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998). "Deliberate indifference describes a state of mind more blameworthy than negligence" but is satisfied by something "less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer, 511 at 835.

#### 2.   Defendants' Arguments

Defendants argue that Arellano is entitled to summary judgment on Plaintiff's conditions of confinement claim for two reasons. First, they argue that Plaintiff's sleeping arrangements, consisting of a dirty mattress and sheets on the floor of his cell,

8

did not constitute a sufficiently serious deprivation. Second, they argue that even if the conditions of the cell were serious enough to violate the Eighth Amendment, Arellano's response to those conditions was not deliberately indifferent, as Arellano had no reason to know that Plaintiff faced a substantial risk to his health or safety while housed in Cell 8B-103.

Defendants cite to numerous cases in which District Courts have found that dirty, stained, or uncomfortable bedding was not sufficiently serious to rise to an Eighth Amendment violation. See Gordon v. Cate, No. 11-CV-03595-JST (PR), 2014 WL 848212, at *4 (N.D. Cal. Feb. 28, 2014) ("[T]hat Plaintiff had to live with a thin, dirty mattress and no pillow for seven days is not sufficiently serious to rise to the level of an Eighth Amendment violation"), aff'd, 633 F. App'x 387 (9th Cir. 2016); Diaz v. Cate, No. C 11-3459 CRB (PR), 2013 WL 4479262, at *5 (N.D. Cal. Aug. 20, 2013) (inmate's one-week "deprivation of a mattress, blanket, and shower, in addition to limited exercise and interrupted and uncomfortable sleep," was insufficient to violate the Eighth Amendment); Muhammad v. Dir. of Corr., No. CIV. S-07-0375 GEB, 2010 WL 3126169, at *7 (E.D. Cal. Aug. 6, 2010) (prisoner's allegations that his mattress was contaminated with blood and urine "do not rise anywhere near the level of an Eighth Amendment violation. Defendants correctly observe that the Ninth Circuit has never published an opinion holding that a dirty or stained mattress constitutes 'cruel and unusual punishment.'"), findings and recommendations adopted, 2010 WL 3565749 (E.D. Cal. Sept. 9, 2010); Muniz v. Hill, No. CV-06-120-ST, 2008 WL 1995457, at *4-6 (D. Or. May 6, 2008) (replacing prisoner's foam-filled mattress with a thinner, sponge-filled security mat for thirty days did not violate the Eighth Amendment); Brown v. Hamblin, No. 03-C-139-C, 2003 WL 23274543, at *2 (W.D. Wis. Apr. 16, 2003) (allegation that prisoner had to sleep on a mattress on the floor for 28 days in a two-month period and 8 days in another month did not amount to cruel and unusual punishment.); cf. Ilsung v. Mobert, No. 1:10-cv-02070-AWI-MJS (PC), 2015 WL 893357, at *9 (E.D. Cal. Mar. 2, 2015) (in

the retaliation context, finding that the failure to exchange a prisoner's sheets for about six weeks was insufficient to allege such a negative impact on one's conditions of confinement that a person of ordinary firmness would be chilled from exercising his first amendment rights), *findings and recommendations adopted*, 2015 WL 1387951 (E.D. Cal. Mar. 25, 2015).

### 3.   Plaintiff's Arguments

Plaintiff's arguments are brief. He states that Arellano was responsible for Plaintiff's placement in Cell 8B-103 and was "totally aware" of the "harsh conditions" of that cell, but refused to issue Plaintiff a clean mattress and bedding or move Plaintiff to a different cell. He states that having to sleep on a stained and smelly mattress on the floor for 40-50 days constitutes an objectively unreasonable deprivation. He cites to no case law or authorities in support of this assertion.

### 4.   Analysis

While the Eighth Amendment does not mandate that prisons be comfortable, neither can they be inhumane. Rhodes v. Chapman, 452 U.S. 337, 347 (1981). To determine whether a particular deprivation violates the Eighth Amendment, the Court must examine the "circumstances, nature, and duration of [the] deprivation." Johnson, 217 F.3d at 731. A deprivation of a basic necessity that lasts only a few days may rise to the level of an Eighth Amendment violation; likewise, a more modest deprivation may form the basis of an Eighth Amendment violation if it is especially lengthy or ongoing. Id. at 731-32. Courts must consider the totality of the conditions of confinement to determine whether a prisoner has been deprived of basic human needs. Rhodes, 452 U.S. at 362-363.

Here, it is undisputed that Plaintiff was provided with a mattress and bedding while he was housed in Cell 8B-103. Plaintiff complains, however, that the mattress was stained and smelly, and that he was unable to exchange his dirty sheets for clean ones during his 40-50 day in the cell.

The Ninth Circuit proscribes the subjection of a prisoner to a lack of sanitation that is "severe or prolonged." Andersen v. County of Kern, 45 F.3d 1310, 1315-15 (9th Cir. 1995). While the Ninth Circuit has not ruled on whether a dirty, stained mattress and dirty bed linens constitute an objectively unreasonable deprivation, other Federal courts have acknowledged the necessity of providing inmates with clean mattresses and bedding on a regular basis. See Pugh v. Locke, 406 F. Supp. 318, 334 (M.D. Ala. 1976) aff'd, in part, 559 F.2d 283 (5th Cir. 1977) rev'd. in part on other grounds, 438 U.S. 781 (1978) (per curiam); Ahrens v. Thomas, 434 F. Supp. 873, 901 (W.D. Mo. 1977) modif. in part, 570 F.2d 286 (8th Cir. 1978). Toussaint v. Rushen, 553 F. Supp. 1365 (N.D. Cal. 1983), relied upon such authorities to conclude that the failure to provide inmates with regular laundry service posed a serious constitutional question. Id. at 1379.

The Court is unprepared to opine as to how long unsanitary conditions of various types may continue before they constitute a serious deprivation in violation of the Eighth Amendment, and it need not do so here. It finds that subjecting one to torn, smelly, blood- and urine-stained bedding without clean linens to protect from foul and a potentially harmful (blood) substances for a period of more than 40 days could support a finding of objective unreasonableness..

Plaintiff also alleges that Arellano was aware of the conditions in Plaintiff's cell and refused to issue Plaintiff a clean mattress and sheets or assign Plaintiff to a different cell. (Pl.'s Opp'n 6.) According to Plaintiff, when he complained to Arellano about the mattress, Arellano said only "that's what he had." (Torres Dep. 95:3-96:3.) Arellano denies knowledge of any such comment.

If the trier of fact believes Arellano responded as Plaintiff suggests and interprets that response as reflecting a conscious disregard of Plaintiff's needs and rights, a finding for Plaintiff on the Eighth Amendment claim could result. Accordingly, summary judgement cannot, at this juncture, be granted Defendant on the conditions of confinement claim.

## B.    Failure to Protect

### 1.    Legal Standard

Prison officials have a duty to protect prisoners from violence at the hands of other inmates. <u>Farmer</u>, 511 U.S. at 833.  The failure of prison officials to protect inmates may rise to the level of an Eighth Amendment violation when "(1) the deprivation alleged is 'objectively, sufficiently serious' and (2) the prison officials had a 'sufficiently culpable state of mind,' acting with deliberate indifference."  <u>Hearns v. Terhune</u>, 413 F.3d 1036, 1040 (9th Cir. 2005) (quoting <u>Farmer</u>, 511 U.S. at 834).

With regard to the first prong, an inmate making a failure to protect claim satisfies the "sufficiently serious deprivation" requirement by "show[ing] that he is incarcerated under conditions posing a substantial risk of serious harm." <u>Lemire v. California Dep't of Corr. & Rehab.</u>, 726 F.3d 1062, 1075 (9th Cir. 2013) (quoting <u>Farmer</u>, 511 U.S. at 834). To satisfy the second prong, deliberate indifference, a defendant must have been aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also have drawn and disregarded that inference.  <u>Farmer</u>, 511 U.S. at 837. While mere negligence on the part of the defendant is not enough to prove liability, <u>id.</u> at 836, a prison official does "not escape liability if the evidence show[s] he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." <u>Id.</u> at 843, n. 8.

### 2.    Defendants' Arguments

Defendants argue that Montanez did not know or have reason to infer that Plaintiff would be exposed to a serious risk of harm at the hands of inmate Diaz. It is undisputed that both Plaintiff and Diaz agreed to cell together, that Plaintiff did not specifically ask Montanez about Diaz's commitment offense, and that Montanez never told Plaintiff that Diaz was a sex offender. Defendants also maintain that it was Lieutenant Armstrong, and not Montanez, who issued the final approval for the double cell assignment after reviewing the information available to him.

12

Defendants further point out that Plaintiff, of his own accord, told Diaz about his commitment offense, thereby instigating Diaz's attack himself..

### 3.    Plaintiff's Arguments

Plaintiff claims that Montanez knew of Plaintiff's fears regarding double-celling with non-sex offenders, as Plaintiff had previously been issued RVRs for refusing cellmates. Montanez also knew that Plaintiff had previously been assaulted by cellmates because he is a sex offender. According to Plaintiff, when Montanez told Plaintiff that Diaz had the "same issues" as Plaintiff, Montanez implied that Diaz was also a sex offender. Plaintiff argues that Montanez deliberately led Plaintiff to believe that he would be safe sharing a cell with Diaz so that Plaintiff would agree to the double cell assignment.

### 4.    Analysis

Viewing the facts in the light most favorable to Plaintiff, the Court believes the circumstantial evidence could support a finding that the October 4, 2014 attack was initiated by Diaz because Diaz learned that Plaintiff was a sex offender. As such, those and other facts could support a finding that Plaintiff faced an "objectively, sufficiently serious" risk of harm. Farmer, 511 U.S. at  834; Hearns, 413 F.3d at 1040. To be deliberately indifferent to that risk, Montanez must have both been aware of facts from which the inference could be drawn that a substantial risk of harm existed and he must also have drawn that inference. Farmer, 511 U.S. at 833.

It is undisputed that Plaintiff never asked Montanez about Diaz's commitment offense and that Montanez never told Plaintiff that Diaz was a sex offender. Plaintiff maintains that Montanez knew Plaintiff preferred to cell with another sex offender. However, whether or not Montanez knew about Plaintiff's preference is not the issue. The issue is whether Montanez knew or should have known that housing Plaintiff with Diaz would put Plaintiff at risk of harm, and yet deliberately disregarded that risk by tricking Plaintiff and facilitating the cell assignment with Diaz. Farmer, 511 U.S. at 837.

To reach the conclusion that Montanez was aware of the risk Plaintiff supposedly faced, the Court would first have to find that Montanez was aware of several predicate facts: (1) that Plaintiff was a sex offender and Diaz was not; (2) that Plaintiff's status as a sex offender would cause Diaz to harm Plaintiff if he knew; and (3) that Diaz was likely to learn Plaintiff was a sex offender. In this regard, Plaintiff argues, in effect, that Montanez's advising Plaintiff that Diaz had the "same issues" is at least circumstantial evidence that Montanez wanted Plaintiff to believe Diaz was also a sex offender and that Plaintiff thus would be safe sharing a cell with Diaz, all in the hope of getting Plaintiff to agree to the double cell assignment. Montanez's knowledge of Plaintiff's history of earlier problems because of his sex offender status could be found to support the conclusion that Montanez should have known Plaintiff would be at risk sharing his cell with a non-sex offender like Diaz. Finally, Montanez's failure to disclose Diaz's non-sex offender status might support the inference that Martinez knew Plaintiff would have refused the cell assignment had it been divulged, thus incentivizing Montanez to keep Diaz's commitment offense a secret.

However, the only evidence in the record that Montanez knew Diaz would try to harm Plaintiff if Diaz learned that Plaintiff was a sex offender is Plaintiff's own speculation as to Montanez's and Diaz's thought process. Such conclusory allegations do not constitute specific facts to support Plaintiff's claim that Montanez was subjectively aware of a risk posed by Diaz. See Thornhill Pub. Co. v. General Tel. & Elec. Corp., 594 F.2d 730, 738 (9th Cir. 1979).

Plaintiff in effect alleges that Montanez knew of Diaz's propensity to attack a sex offender – though there is no evidence that Diaz had such a propensity – or should have known of it simply because, as Plaintiff claims, non-sex offender prisoners always pose a substantial threat to sex offender prisoners. The Court cannot credit such a broad and unsupported assumption. Soremekun, 509 F.3d at 984. Were Plaintiff to present evidence that Diaz had a history of violence against sex offenders, that Diaz

14

threatened Plaintiff prior to their altercation, or that other circumstances existed to put Montanez on notice that Diaz posed a threat to Plaintiff, the analysis might be different. See, e.g., Hearns, 413 F.3d at 1040-41 (prisoner sufficiently alleged deliberate indifference where officials knew of tensions and frictions between groups of Muslim inmates, knew of attacks orchestrated by ruling Muslims against disobedient Muslims, and knew of a prior attack by ruling Muslims against the plaintiff); Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1050 (9th Cir. 2002) (in a suit against prison officials for failing to protect decedent, who was murdered by his cellmate, the Court noted that if any of the officers knew the cellmate had acted out dangerously or was a threat to decedent, their conduct would violate the Eighth Amendment.). As it stands, however, Plaintiff's broad and unsupported statement that Defendant should have known that Diaz was a threat to Plaintiff does not raise a triable issue. Defendants are thus entitled to judgment in their favor on this claim.

### C.     Retaliation against Plaintiff for Complaining about Montanez

#### 1.     Legal Standard

It is well-settled that § 1983 provides a cause of action against prison officials who retaliate against inmates for exercising their constitutionally protected rights. Pratt v. Rowland, 65 F.3d 802, 806 n. 4 (9th Cir. 1995) ("[R]etaliatory actions by prison officials are cognizable under § 1983.") Within the prison context, a viable claim of retaliation entails five basic elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his constitutional rights, and (5) the action did not reasonably advance a legitimate correctional goal." Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005); accord Watison v. Carter, 668 F.3d at 1114-15; Silva v. Di Vittorio, 658 F.3d 1090, 1104 (9th Cir. 2011); Brodheim v. Cry, 584 F.3d at 1269.

The second element focuses on causation and motive. See Brodheim v. Cry,

584 F.3d 1262, 1271 (9th Cir. 2009).  A plaintiff must show that his protected conduct was a "'substantial' or 'motivating' factor behind the defendant's conduct."  Id. (quoting Sorrano's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir. 1989).  Although it can be difficult to establish the motive or intent of the defendant, a plaintiff may rely on circumstantial evidence.  Bruce v. Ylst, 351 F.3d 1283, 1289 (9th Cir. 2003) (finding that a prisoner established a triable issue of fact regarding prison officials' retaliatory motives by raising issues of suspect timing, evidence, and statements); Hines v. Gomez, 108 F.3d 265, 267-68 (9th Cir. 1997); Pratt, 65 F.3d at 808 ("timing can properly be considered as circumstantial evidence of retaliatory intent").

In terms of the third prerequisite, filing a complaint or grievance is constitutionally protected. Valandingham v. Bojorquez, 866 F.2d 1135, 1138 (9th Cir. 1989).

With respect to the fourth prong, the correct inquiry is to determine whether an official's acts "could chill a person of ordinary firmness from continuing to engage in the protected activity[]." Pinard v. Clatskanie School Dist. 6J, 467 F.3d 755, 770 (9th Cir. 2006); see also White v. Lee, 227 F.3d 1214, 1228 (9th Cir. 2000).

With respect to the fifth prong, a prisoner must affirmatively allege that "'the prison authorities' retaliatory action did not advance legitimate goals of the correctional institution or was not tailored narrowly enough to achieve such goals." Rizzo v. Dawson, 778 F.2d 527, 532 (9th Cir. 1985).

### 2.    Defendants' Arguments

Defendants argue, first, that Montanez did not know of Plaintiff's complaint at the October 16, 2014 committee hearing, and so it could not have caused him to conduct the search that same day; second, that Montanez's search cell advanced a legitimate penological goal; and, third, that there is no allegation, much less evidence, that Montanez improperly confiscated or destroyed any of Plaintiff's property during the October 16, 2014 search.

### 3.    Plaintiff's Arguments

Plaintiff asserts that Montanez was "standing next to" Plaintiff when Plaintiff made his complaint at the October 16, 2014 hearing, and that every time Plaintiff left his cell, Montanez searched it, confiscated Plaintiff's personal belongings, and left the cell in a state of disarray.

### 4.    Analysis

Montanez neither admits nor denies that he searched Plaintiff's cell on October 16, 2014 and thereafter; he merely states that if he did search Plaintiff's cell, it was pursuant to CDCR policy. Similarly, Montanez does not dispute that Plaintiff reported Montanez for misconduct during the October 16, 2014 committee hearing; he simply states that he does not recall hearing Plaintiff do so. Assuming  that the numerous and disruptive cell searches could constitute an adverse action, questions remain as to : (1) whether the searches were motivated by Plaintiff's complaint and (2) whether they advanced a legitimate penological goal.

Motive may be determined by looking to circumstantial evidence. <u>Bruce</u>, 351 F.3d at 1288-89. Here, Plaintiff alleges that after Montanez escorted Plaintiff to the committee meeting and overheard Plaintiff's complaints, he searched Plaintiff's cell the same day and again several times thereafter. These searches left Plaintiff's cell in a state of disarray. On these circumstances, a jury could conclude that Montanez searched Plaintiff's cell on October 16, 2014 and thereafter because of Plaintiff's complaint.

However, Plaintiff still bears the burden of pleading and proving the absence of a legitimate penological objective for the searches. <u>Pratt</u>, 65 F.3d at 806. It is well-established that prison officials must be allowed to conduct random searches of inmates' cells, as such searches are the best tool against the proliferation of weapons and drugs. <u>Hudson v. Palmer</u>, 428 U.S. 517, 518 (1984). Here, Defendants maintain that any search Montanez conducted of Plaintiff's cell was simply a randomized search

designed to preserve institutional security. Plaintiff maintains his cell was specifically targeted because of his complaint.

It is undisputed that Montanez himself selected which cells he would search during his shifts. Montanez does not deny that Plaintiff's cell was searched multiple times within a short period. A reasonable juror could conclude therefrom that Montanez indeed overheard Plaintiff's complaints and chose to search Plaintiff's cell more often, and more aggressively, than he otherwise would have. Plaintiff has thus raised a genuine issue of material fact as to retaliation.

### D.    Qualified Immunity

As Defendants are entitled to judgment in their favor on Plaintiff's failure to protect claim, the Court need not evaluate whether a qualified immunity defense to that claim might exist.  It will however address Defendants' qualified immunity defense as it relates to Plaintiff's conditions of confinement and retaliation claims.

#### 1.    Legal Standard

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Mattos v. Agarano, 661 F.3d 433, 440 (9th Cir. 2011) (citing Pearson v. Callahan, 555 U.S. 223, 231 (2009) (additional citation omitted)). "Qualified immunity shields an officer from liability even if his or her action resulted from a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Id. (citation and quotation marks omitted). "The purpose of qualified immunity is to strike a balance between the competing need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Id. (citation and quotation marks omitted).

In determining whether an official is entitled to qualified immunity, courts employ a two-pronged inquiry. The Court has discretion to address the two-step inquiry in the

order it deems most suitable under the circumstances. <u>Pearson</u>, 555 U.S. at 236 (overruling holding in <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), that the two-step inquiry must be conducted in that order, and the second step is reached only if the court finds a constitutional violation.) The first prong asks whether the state actor violated the plaintiff's constitutional right; if the answer to that question is "yes," courts must then determine whether the constitutional right was "clearly established in light of the specific context of the case" at the time of the events in question. <u>Id.</u> (citing <u>Robinson v. York</u>, 566 F.3d 817, 821 (9th Cir. 2009) and <u>Saucier</u>, 533 U.S. at 201).

"For the second step in the qualified immunity analysis—whether the constitutional right was clearly established at the time of the conduct—the critical question is whether the contours of the right were 'sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.' " <u>Mattos</u>, 661 F.3d at 442 (quoting <u>Ashcroft v. al–Kidd</u>, 563 U.S. 731 (2011) (some internal marks omitted)). "The plaintiff bears the burden to show that the contours of the right were clearly established." <u>Clairmont v. Sound Mental Health</u>, 632 F.3d 1091, 1109 (9th Cir. 2011). "[W]hether the law was clearly established must be undertaken in light of the specific context of the case, not as a broad general proposition" <u>Estate of Ford</u>, 301 F.3d at 1050 (citation and internal marks omitted). In making this determination, courts consider the state of the law at the time of the alleged violation and the information possessed by the official to determine whether a reasonable official in a particular factual situation should have been on notice that his or her conduct was illegal. <u>Inouye v. Kemna</u>, 504 F.3d 705, 712 (9th Cir. 2007); <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002) (the "salient question" to the qualified immunity analysis is whether the state of the law at the time gave "fair warning" to the officials that their conduct was unconstitutional). "[W]here there is no case directly on point, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" <u>C.B. v. City of Sonora</u>, 769 F.3d 1005, 1026 (9th Cir. 2014) (citing <u>al–Kidd</u>, 563 U.S. at 740). An

official's subjective beliefs are irrelevant. Inouye, 504 F.3d at 712.

### 2.   Discussion

#### i.   Conditions of Confinement

Defendants argue that it was not clearly established in August and September 2014 that requiring an inmate to sleep on a dirty mattress and sheets on a cell floor for several weeks violated the Eighth Amendment. As stated above, the Ninth Circuit has not ruled on this issue, and several lower courts in this circuit have found that similar conditions do not rise to the level of an Eighth Amendment violation. See Muhammad, 2010 WL 3126169; Muniz, 2008 WL 1995457; Brown, 2003 WL 23274543. Moreover, courts in other circuits have found similar conditions did not make out an Eighth Amendment claim. Alfred v. Bryant, 378 Fed. App'x 977, 980, 2010 WL 1881064 (11th Cir. 2010) (prisoner's claim that he had to live in a cell for 18 days without a mattress and properly functioning toilet did not rise to the level of an Eighth Amendment violation, where there was no evidence the prisoner faced an unreasonable risk of serious harm to his health or safety); Peterkin v. Jeffes, 855 F.2d 1021, 1026-27 (3d Cir. 1988) (requiring death row inmates to sleep on a dirty mattress on the floor in a cell with dirty toilets and sinks did not inflict cruel and unusual punishment); Wilson v. Schomig, 863 F. Supp. 789, 795 (N.D. Ill. 1994) (prisoner's claim that he had to sleep on a mattress stained with urine and feces for several months fell short of the objectively unreasonable standard; "while not a pleasant condition of confinement, there [was] no allegation that [plaintiff] suffered any physical harm from the stains on the mattress."); McNatt v. Unit Manager Parker, No. 3:99CV1397 AHN, 2000 WL 307000, at *3-4  (D. Conn. Jan. 18, 2000) (totality of cell conditions for state prisoners, including stained and smelly mattresses, no clean bedding, no toiletries, no clean clothing, dirty showers, and no cleaning supplies for six days did not violate the Eighth Amendment); but see Bell v. Luna, 856 F. Supp.2d 388, 401 (D. Conn. 2012) (prison official not entitled to qualified immunity where he forced an inmate to sleep on a torn, unstuffed, unhygienic mattress

for nearly seven months)

Indeed, the law remains unsettled as to whether a prison official who supplies an inmate with no bedding whatsoever commits a constitutional violation. See Jones v. Neven, -- Fed. App'x --, 2017 WL 431413, at *2 (9th Cir. Feb. 1, 2017) (defendants entitled to qualified immunity on Plaintiff's claim that he was forced to sleep on the floor); Chappell v. Mandeville, 206 F.3d 1052, 1060 (9th Cir. 2013) (noting there is no clear legal guidance on "whether mattress deprivation [requiring prisoner to sleep on a concrete floor for seven days] was an Eighth Amendment violation."); Schroeder v. Kaplan, 60 F.3d 834, 1995 WL 398878, at *2 (9th Cir. July 7, 1995) (unpublished) (where a prisoner was forced to sleep on a cold concrete floor without a mattress for most of a month, the law was not clearly established on whether mattress deprivation was an Eighth Amendment violation.)

Here, Plaintiff was provided a mattress and bedding. At the time, it was not clearly established that the condition of those items as described by Plaintiff was objectively unreasonable under the Eighth Amendment. Defendants are thus entitled to qualified immunity on Plaintiff's conditions of confinement claim.

### ii.    Retaliation

The record indicates the October 16, 2014 complaint against Montanez was purely verbal. According to Plaintiff, while Montanez was standing next to him, Plaintiff verbally reported to Gutierrez that Montanez had engaged in misconduct. Defendants contend that even if Montanez in fact searched Plaintiff's cell in retaliation for his making that complaint, it was not then clearly established that a verbal complaint constituted protected conduct. Defendants rely on Ahmed v. Ringler, No. 2:13-cv-1050-MCE-DAD, 2015 WL 502855, at *7 (E.D. Cal. Feb. 5, 2015) (finding that officials were entitled to qualified immunity because even though inmate's verbal complaint was protected conduct, the law was not clearly established at the time of the alleged conduct in 2012), findings and recommendation adopted, 2015 WL 1119675 (E.D. Cal. Mar. 11, 2015)

and Savage v. Villagrana, No. 1:11-cv-0599-AWI-DLB, 2013 WL 398691, at *4 (E.D. Cal. Jan. 31, 2013) (allegation that prisoner made verbal complaint against prison official insufficient to show that prisoner engaged in protected conduct for purposes of retaliation claim), *findings and recommendation adopted*, 2013 WL 1156455 (E.D. Cal. Mar. 20, 2013).

The Ahmed case merits closer examination. There, two correctional officers, Ringler and Scotland, searched plaintiff's cell and confiscated his television and radio, believing them to be contraband. When plaintiff produced documentation establishing his rightful ownership, the property was returned. The plaintiff observed that his radio had been damaged due to defendant Ringler's attempt to open it to look for contraband. Plaintiff verbally complained to a sergeant in both defendants' presence, whereupon defendant Ringler reached over and broke off a piece of the plaintiff's radio and defendant Scotland warned the plaintiff that the searches would continue if the plaintiff continued to press the issue. After the plaintiff filed a formal grievance, defendant Ringler searched plaintiff's cell immediately after another officer had searched it; another time, defendant Ringler searched Plaintiff's cell and confiscated more property. Ahmed, 2015 WL 502855, at *1.

The Court found that a reasonable fact finder could conclude that the defendants' actions—breaking a piece off of Plaintiff's radio and threatening to conduct more searches—were in retaliation for Plaintiff's verbal complaint. Id. at * 4-5. However, the Court found that the defendants were entitled to qualified immunity, as it was not clearly established that a prisoner's verbal complaints constituted protected conduct. Id. at *6-7. The Court denied qualified immunity as to the retaliatory searches that followed Plaintiff's formal written grievance. Id. at *8.

Here, it is undisputed that Plaintiff's October 16, 2014 complaint was verbal, and that Plaintiff filed a written grievance approximately ten days after the complaint. While Plaintiff claims he was subjected to multiple retaliatory searches, he fails to specify

when those searches took place or whether they preceded or followed his formal written complaint. Lacking any indication that Montanez conducted his retaliatory searches after Plaintiff filed the written complaint; the Court will focus on whether Plaintiff's October 16, 2014 verbal statement constituted protected speech for the purposes of the October 16, 2014 search.

Neither the Ninth Circuit nor the Supreme Court has decided whether a prisoner's verbal complaints constitute protected conduct. Ahmed, 2015 WL 502855, at *7 (citing Teahan v. Wilhelm, No. 06cv15 JM (PCL), 2007 WL 5041440, at *9 (S.D. Cal. Dec. 21, 2007) ("Surprisingly, prisoners rarely invoke oral complaints as the basis of their retaliation claims—written complaints compose the backbone of most.") Several courts within the Circuit have considered the issue, yet have not reached a consensus. Compare Merrick v. Ellis, Case No. 5:15-cv-1052 MMM (GJS), 2015 WL 9999194, at *5-6 (C.D. Cal. Nov. 30, 2015) ("Without deciding the issue, the Court has reason to doubt that the form of a grievance is a proper distinction to be drawn in terms of a 'clearly established right.'") findings and recommendation adopted, 2016 WL 447796 (C.D. Cal. Feb. 4, 2016); West v. Dizon, No. 2:12-cv-1293 MCE DAD P, 2014 WL 794335, at *5 (E.D. Cal. Feb. 27, 2014) (protected speech includes a prisoner's verbal expression of an intent to submit a formal written grievance); Hackworth v. Torres, No. 1:06-CV-773-RCC, 2011 WL 1811035, at 6 (E.D. Cal. May 12, 2011) (rejecting the defendants' argument that only filing written grievances constitutes protected conduct); Uribe v. McKesson, Civil No. 08CV01285 DMS (NLS), 2011 WL 9640, at *12 (E.D. Cal. Jan. 3, 2011) (a prisoner's reporting of misconduct, either verbally or in writing, constitutes protected conduct); with Williams v. Bahadur, No. 2:13-cv-2052-TLN-EFB P, 2016 WL 758782, at *5-6 (E.D. Cal. Feb. 26, 2016) ("Because it was not well-established in 2011 that a verbal protest constituted conduct protected by the First Amendment, plaintiff's retaliation claim . . . which is based solely on his verbal protest of [his] job assignment, must be dismissed on the basis of qualified immunity."); Turner v.

23

Zuniga, No. CV 13-1787-MMM (AGR), 2015 WL 5265442, at *3-4 (C.D. Cal. Apr. 15, 2015) (recommending granting qualified immunity on the plaintiff's retaliation claim because it was not clearly established that an inmate's verbal threat to file a lawsuit was protected conduct), *report and recommendation accepted*, 2015 WL 5286031 (C.D. Cal. Sept. 9, 2015); Ahmed, 2015 WL 502855 at *4; see also Johnson v. Carroll, No. 2:08-cv-1494 KJN P, 2012 WL 2069561, at *34 (E.D. Cal. June 7, 2012) (prisoner's verbal challenge to a defendant's harassing strip search not protected speech); Teahan, 2007 WL 5041440, at *8 (prisoner's oral objection to prison guard's removal of his property not protected speech).

The facts of the instant case are comparable to those of Ahmed. Like the plaintiff there, Plaintiff here verbally expressed his dissatisfaction with Defendant to a superior in the presence of the Defendant.  It was not clearly established in October 2014 that a prisoner's verbal complaints, such as Plaintiff's here, constituted protected conduct in the First Amendment retaliation context. al-Kidd, 563 U.S. at 740 (to defeat qualified immunity where there is no case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate.")[1] Defendants are thus entitled to judgment in their favor on the grounds of qualified immunity on Plaintiff's retaliation claim.

---

[1] In issuing this finding, the Court is cognizant that it seems inapposite to assume that a prisoner's right to file a *written* complaint is protected, but his right to make the same complaint *verbally* is not. The purpose of both complaints is the same—to seek redress for a wrong. As the Court in West noted, "there is no legal distinction between the filing of a charge which is clearly protected and threatening to file a charge. The conduct which is protected in both the pursuit of litigation and the grievance procedures is the First Amendment right to petition for redress." 2014 WL 794335, at *5 (internal quotation marks omitted).  It is clearly unlawful for a prison official to retaliate against an inmate for making a written complaint. Valandingham, 866 F.2d at 1138. A reasonable prison official would not have believed it was lawful to retaliate against an inmate for making his complaint verbally. See Jeffers v. Gomez, 267 F. 3d 895, 910 (9th Cir. 2001). Indeed, a prison official should not be immunized from liability simply because he had the opportunity to carry out his retaliatory act before the inmate could commit his complaint to writing. Nonetheless, until a higher court settles the issue, the Court is bound to find in Defendants' favor.

**V.   Conclusion**

Based on the foregoing, IT IS HEREBY ORDERED that:

1.   Defendants' motion for an extension of time to file a dispositive motion (ECF No. 59) is GRANTED, nunc pro tunc to October 7, 2016; and

IT IS HEREBY RECOMMENDED that:

2.   Defendants' motion for summary judgment (ECF No. 61) be GRANTED in full.

These Findings and Recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within **fourteen** (14) days after being served with these Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."   Any reply to the objections shall be served and filed within **fourteen** (14) days after service of the objections.  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   March 24, 2017           /s/ *Michael J. Seng*

UNITED STATES MAGISTRATE JUDGE